UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CYBER SOLUTIONS INTERNATIONAL, LLC,

    Plaintiff,

Case No. 1:13-CV-867

v.

HON. ROBERT HOLMES BELL

PRIVA SECURITY CORPORATION, et al.,

    Defendants.
_____/

# O P I N I O N

This action involving conflicting claims to encryption technology is before the Court on the parties' cross-motions for summary judgment on Defendant Pro Marketing Sales' counterclaim for declaratory judgment. (ECF Nos. 29, 45.)[1] For the reasons that follow, Defendant's motion will be granted and Plaintiff's motion will be denied.

## I.

Defendant Priva Technologies, Inc. developed microchip encryption technology known as Secured Key Storage Integrated Circuit ("SKSIC"). The SKSIC technology provides a unique means of confirming a person's identity when that person is attempting to access data that is either stored or in transmission. The SKSIC chip is sufficiently foolproof

---

[1] The original complaint was filed in Case No. 1:13-CV-202. After a remand to the bankruptcy court, Bankr. No. 13-80076, the case was re-filed in this court under Case No. 1:13-CV-867. This opinion will reference pleadings filed under all three case numbers.

to warrant its application in circumstances where the information in question is highly classified. (Hughes 6/19/12 Oral Confirmation Op., Tr. 14, No. 1:13-CV-202, ECF No. 13-3.) Defendant Pro Marketing Sales ("PMS" or "Pro Marketing") has a first position lien on all assets of Priva, including the SKSIC, pursuant to an April 16, 2009, security agreement entered into in conjunction with a loan Pro Marketing made to Priva.[2] (Sec. Agrmt., ECF No. 45-25.)

Before Priva had sufficiently perfected its invention for marketing, its creditors began demanding repayment. Priva filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Act. *In re Priva Technologies, Inc.*, No. HK 11-12574 (Bankr. W.D. Mich.). On March 8, 2012, Pro Marketing filed a motion for relief from stay to enable it to commence proceedings to foreclose on substantially all of the Debtors' assets. (Reorg. Plan, Disclosure Statement at 18, No. 1:13-CV-202, ECF No. 1-3, Page ID#98.) On April 19, 2012, Priva entered into a Design Service and Intellectual Property License Agreement ("License Agreement" or "IP License") with Plaintiff Cyber Solutions, International, LLC ("CSI"). (IP License, ECF No. 45-3.) Priva granted CSI an exclusive license to its SKSIC technology in exchange for $200,000, an additional $200,000 advance for future design

---

[2] Pro Marketing and Priva agreed that the Security Agreement secured a debt owed by Priva to Pro Marketing in the amount of $1.6 million principal, which, together with accrued interest, resulted in a total obligation of $1,953,872.71 as of January 24, 2013, the date of the Asset Transfer Agreement. (Asset Transfer Agrmt, ECF No. 45-13.) As of October 24, 2014, Pro Marketing claimed that over $3.4 million was due on the note. (Dales Oct. 24, 2014, Op. 15, ECF No. 40.)

services by Priva related to the SKSIC technology, and the promise of substantial royalties over time from military and commercial applications. The License Agreement grants CSI "a worldwide, perpetual, royalty-bearing, exclusive license to the Licensed Technology to develop, make, have made, manufacture, use, import, export, offer to sell and sell Products and Systems incorporating the Licensed Technology . . . ." (License Agrmt § 2.1.) The License Agreement also provides that CSI "shall have the right to pursue improvements to the Licensed Technology" and that CSI "shall own and have exclusive title to improvements." (License Agrmt § 2.3.) Section 5.2 of the License Agreement provides that "Any updates, modifications or improvements to the Licensed Technology developed by Licensor and paid for by Licensee shall be the property of Licensee." (License Agrmt § 5.2)

> Licensed Technology is defined to mean:
>
> [A]ll Intellectual Property and Know-How (i) owned by Licensor; and (ii) incorporated in or specifically relating to the SKSIC delivered to Licensee hereunder. Any updates, modifications or improvements to the Licensed Technology developed by Licensor after the Effective Date and not paid for by Licensee under the Design Services in Article 6 will be deemed part of the Licensed Technology and Licensor will provide such updates, modifications or improvements to Licensee as soon as commercially practicable.

(License Agrmt § 1.7.)

The License Agreement was the central feature of the Reorganization Plan. The Plan was approved by the Bankruptcy Court over Pro Marketing's objections. Although the Plan gave CSI an exclusive license to use and develop the SKSIC technology, it preserved the security interest of Pro Marketing in the SKSIC IP. (Plan at 20.) Judge Hughes noted that

"while the technology is being licensed to CSI, that license is subordinate to Pro Marketing Sales' superior lien." (Hughes Confirm. Op. 35.) Judge Hughes further noted that "if Priva were to default under the terms of the plan such that Pro Marketing could exercise its collateral rights, it would be able to recover . . . the SKSIC technology in whole notwithstanding the license that is being granted as part of this plan." (*Id*.)

After entering into the License Agreement, Priva began developing a second generation SKSIC product for CSI known as Tamper Reactive Secure Storage ("TRSS"), with product number PDS8006-B. (Am. Compl. ¶ 15, ECF No. 12.)

The License Agreement did not generate the revenues that Priva expected. Less than a year after the Plan was confirmed, Priva continued to suffer cash shortages and was unable to meet its obligations. (Dales Op. at 5.) On January 25, 2013, Priva's Board determined that Priva did not have adequate funds to continue operations. (Berman Decl. ¶ 5, ECF No. 45-11.) The Security Agreement provides that on default Pro Marketing may take possession and control of the Collateral and Proceeds with or without judicial process, and proceed to exercise the rights and remedies accorded to a secured party under the UCC. (Security Agrmt ¶ 12, ECF No. 45-25.) Priva determined that a friendly foreclosure with Pro Marketing was its best option. (Sibert Dep. 23-24, ECF No. 30-1.) Priva's Board entered into an Asset Transfer and Transition Funding Agreement and surrendered the SKSIC and the computer servers containing the intellectual property to Pro Marketing. (Asset Transfer Agrmt, ECF No. 30-3.) Thereafter, Priva's president, William Sibert, sent CSI a letter

terminating the License Agreement based on his assertion that CSI breached certain obligations under the License Agreement. (Sibert Letter, ECF No. 45-12.)

On February 22, 2013, CSI filed an action in this Court requesting a temporary restraining order prohibiting Pro Marketing from selling or disposing of the SKSIC technology. *Cyber Solutions, Int'l, LLC v. Priva Securities Corp.*, 1:13-CV-202 (W.D. Mich.). CSI contends that it did not breach any obligations under the License Agreement, and further contends that the TRSS technology belongs to CSI and is not subject to Pro Marketing's security interest. CSI seeks an order declaring that the License Agreement is valid and enforceable by CSI, declaring that CSI is the owner of the TRSS Technology, enjoining Defendants from disposing of the SKSIC and PDS8006B Technology, requiring Defendants to transfer the TRSS Technology to CSI, and awarding CSI compensatory damages. (Am. Compl., ECF No. 12.) Pro Marketing filed a counterclaim seeking a declaration that it lawfully possesses Priva's collateral and that it is permitted to market, sell, or license the SKSIC/TRSS technology. (ECF No. 14.)

This Court referred CSI's motion for preliminary injunction to the bankruptcy court. In April 2013, the Priva Chapter 11 reorganization was converted to a Chapter 7 bankruptcy and a Trustee was appointed.

After a two-day evidentiary hearing in May 2013, Judge Hughes granted CSI's request for a preliminary injunction enjoining Pro Marketing from disposing of the SKSIC technology. However, he denied CSI's motion for an order requiring Pro Marketing to

deposit the property in third-party escrow. (Order, Bankr. No. 13-80076, ECF No. 44.) In his June 5, 2013, bench opinion, Judge Hughes found that CSI was likely to prevail on its argument that it did not breach the License Agreement, and that the claimed breaches did not warrant termination of the License Agreement. (Hughes June 5, 2013, Prelim. Inj. Oral Op., Tr. 26, Bankr. No. 13-80076, ECF No. 42.) However, he emphasized that his ruling was limited to the issue of whether CSI was in breach of the License Agreement, and that he was making no ruling on whether Pro Marketing should be restrained in its own right from enforcing its own security interest in the SKSIC technology now that Priva had filed for Chapter 7 relief. (*Id.* at 31-32.) Judge Hughes nevertheless deemed it important to preserve the status quo until the Chapter 7 Trustee had more time to determine what position the estate would take vis-à-vis the SKSIC technology – whether surrendering it to Pro Marketing was best, or whether it wanted to try to continue the License Agreement with Priva in the hope of obtaining royalties for the estate. (*Id.* at 38-39.)

The matter came back before this Court under the current case number. (ECF No. 1, Mot. to Withdraw Ref.) After a settlement conference, the Trustee and CSI entered into a proposed settlement. Because the proposed settlement involved the Trustee's authority to amend the License Agreement, the matter was referred back to the Bankruptcy Court. On July 22, 2014, Judge Dales held that the property surrendered to Pro Marketing before conversion to Chapter 7 is included within the property of the Chapter 7 estate. (Dales Op. 5 n.3.) After a four-day evidentiary hearing, Judge Dales denied the proposed settlement

6

based on his conclusion that the proposal to amend the License Agreement after the conversion to a Chapter 7 bankruptcy was not based on sound business judgment and was inconsistent with Pro Marketing's interests. (*Id.* at 21.)

The case is now back before this Court. Pro Marketing has requested summary judgment on its counterclaim for a declaration that it lawfully possesses the collateral and can sell it because it properly foreclosed on its security interest in the SKSIC/TRSS technology. CSI opposes the motion and has requested summary judgment in its favor on the counterclaim.

## II.

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the movant carries its burden of showing there is an absence of evidence to support a claim, the non-moving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In reviewing a motion for summary judgment this Court cannot weigh the evidence,

make credibility determinations, or resolve material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (stating that on a motion for summary judgment "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). "Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569-70 (6th Cir. 2012) (citing *Matsushita*, 475 U.S. at 587; *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 252. The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### III.

Pro Marketing moves for summary judgment on its counterclaim based on its assertion that it is entitled to possession of the SKSIC technology pursuant to its security agreement. Based on the language of the Reorganization Plan and Judge Hughes's explanation for his approval of the Plan, the Court finds that there is no question of fact that Pro Marketing has a priority interest in the SKSIC technology and that as a result of Priva's default on its indebtedness, Pro Marketing has the right to enforce its security interest. According to Pro Marketing, this should be the end of the Court's analysis. Priva has, however raised some issues that need to be considered.

8

**A. Automatic Stay**

CSI contends, as a preliminary matter, that Pro Marketing does not have standing to seek validation of its foreclosure because the automatic stay in bankruptcy has not been lifted. In response, Pro Marketing has advised the Court that the Trustee has agreed to lift the stay if this Court dissolves the preliminary injunction. (PMS Reply at 4.)

Pro Marketing's representation is consistent with the parties' statement in their joint status report that the bankruptcy court determined that it did not have jurisdiction to rule on Pro Marketing's motion for dissolution of the preliminary injunction order given the terms of this Court's limited reference order. (Jt. Status Rpt, ECF No. 38.) The bankruptcy court is clearly anticipating that this Court will make the determination regarding Pro Marketing's rights under its Security Agreement. As Judge Dales indicated, "[a]nother court with broader jurisdiction . . . may decide whether the TRSS belongs to CSI free and clear of, or subject to, Pro Marketing's security interest." (Dales Op. 10 n.7.) This case has been bouncing between the two courts long enough, and the parties are entitled to a ruling on Pro Marketing's rights under its Security Agreement. Accordingly, the Court is satisfied that Pro Marketing has standing to bring its motion for summary judgment on its counterclaim.

**B. Pro Marketing's Interest in the TRSS**

There is no dispute that Pro Marketing has a security interest in the SKSIC technology. The April 16, 2009, Security Agreement gave Pro Marketing a first priority security interest in all of the Collateral of Priva. (Sec. Agrmt ¶ 2, ECF No. 45-25.) The heart of the parties' dispute concerns which party has superior rights to the improvements to the

9

SKSIC technology, known as the TRSS. The Court assumes that the TRSS is not severable from the SKSIC technology because this argument was not made either at the preliminary injunction hearing or in conjunction with the present motion.

CSI contends that it owns the improvements to the SKSIC technology pursuant to the terms of the License Agreement that was made a part of the Reorganization Plan. Pro Marketing contends that its security interest covers improvements to the SKSIC technology.

Pro Marketing's Security Agreement defines "collateral" as all types or items of personal property owned by Priva, "whether now owned or hereinafter arising or acquired," including "all Intellectual Property" and "all products and Proceeds of any and all" of the property described. (Sec. Agrmt ¶ 1.) The Security Agreement defines "Intellectual Property" to include Copyrights, and defines "Copyrights," to mean:

> all copyrights arising under the laws of the United States, . . . including without limitation all mask works fixed in semiconductor chip products (as defined under 17 U.S.C. §901 of the U.S. Copyright Act), whether registered or unregistered, published or unpublished, now or hereafter in effect and all registrations and recordings thereof, and . . . (iv) all proceeds of any of the foregoing, including, without limitation, all licenses, royalties, income, payments, claims, damages, and proceeds of suit now or hereafter due and/or payable arising from, out of or in connection with any of the foregoing.

*Id*.

Notwithstanding the broad language of the Security Agreement, CSI asserts that Pro Marketing has no security interest in the TRSS. CSI contends that pursuant to the terms of the License Agreement, which was part of the Bankruptcy Reorganization Plan, CSI owns all subsequent generations of the SKSIC technology, including the TRSS. The License

10

Agreement specifically provides that "Licensee shall have the right to pursue improvements to the Licensed Technology" and that "Licensee shall own and have exclusive title to improvements." (License Agrmt ¶ 2.3.) CSI contends that because the License Agreement was a central part of the Reorganization Plan, and because Pro Marketing did not appeal the Reorganization Plan, Pro Marketing cannot challenge the provision in the License Agreement that gives CSI exclusive title to improvements.

The Court disagrees. The License Agreement between Priva and CSI explicitly recognized that "SKSIC is subject to certain liens and security interests which continue notwithstanding Licensor's entry into this License Agreement." (License Agrmt Recitals.) Moreover, Pro Marketing's interest in improvements to the SKSIC was not altered by the Bankruptcy Reorganization Plan. Consistent with the Security Agreement, the Plan gives Pro Marketing "a Lien on any Pro Marketing Collateral, . . . with the same priority that existed prior to the Petition Date and to the extent of the unpaid balance of the Allowed Pro Marketing Secured Claim, until the Allowed Pro Marketing Secured claim is paid in full. The Plan provides that "Pro Marketing will retain its Lien on the SKSIC IP, in accordance with § 1129(b)(2)(A) of the Bankruptcy Code, notwithstanding the Reorganized Debtor's entry into the License Agreement or the grant of the License" until Pro Marketing's Secured Claim is paid in full. (Plan § 5.2.4.)

Judge Hughes, in approving the Plan over Pro Marketing's objection, made it clear that in the event Priva failed to live up to its end of the bargained reorganization, CSI's License remained subordinate to Pro Marketing's lien. Judge Hughes explicitly

11

acknowledged Pro Marketing's rights to reclaim the collateral after a breach:

> The Court would also add that, while the technology is being licensed to CSI, that license is subordinate to Pro Marketing Sales' superior lien. And, as such, if Priva were to default under the terms of the plan such that Pro Marketing could exercise its collateral rights, it would be able to recover. . . the SKSIC technology in whole notwithstanding the license that is being granted as part of this plan.

(Hughes Confirmation Op. 35.)

Judge Hughes reiterated his rationale for approving the Plain in his opinion on the preliminary injunction:

> (1) Cyber solutions itself acknowledged in the recitals of the licensing agreement that the SKSIC technology was subject to PMS's continuing lien in the same, and (2) whether or not PMS's lien would have continuing priority over Cyber Solutions' license rights was a key issue in this Court's own determination last summer as to whether the plan that Priva proposed could be confirmed over PMS's objection. In particular, this Court was very concerned whether the license being contemplated between Cyber Solutions and Priva was in fact a 363 sale of the technology free and clear of PMS's lien interest, given that the license was to be perpetual and exclusive and worldwide. This of course gave the Court pause because PMS was an objecting class whose interest in Priva's collateral could not be impaired under Section 1129(b)'s absolute priority rule. As such, the Court went forward with confirmation only after first receiving assurances from Priva that PMS's interest were not being so impaired; that is, that Cyber Solutions was gaining its license rights to the SKSIC technology subject to PMS's own lien of rights in the same, and therefore Cyber Solutions was assuming the risk that these rights might be disrupted were Priva later to default under the separate arrangement it had with PMS concerning its claim and attendant lien rights under the confirmed plan.

(Hughes Prelim. Inj. Op. 32-33.) More recently, Judge Dales confirmed that the bankruptcy court's approval of Priva's Plan of Reorganization "clearly preserved the security interest of Pro Marketing in the Debtor's technology, specifying that CSI's interest in the technology under the Original License was subordinate to the interests of PMS." (Dales Op. 4.) As

Judge Dales reiterated,"[t]he Plan explicitly preserves PMS's security interest as it needed to do in order to pass muster under § 1129(b)(2)(A)(i)(l)." (Dales Op. 13.)

Although the License Agreement purports to grant CSI ownership over improvements to the SKSIC, Priva did not have authority to grant such ownership to CSI in light of the terms of Pro Marketing's security interest. CSI itself has acknowledged that the TRSS technology is a "derivative product" that is "based upon the SKSIC Technology". (Am. Compl. ¶¶ 15, 17, ECF No. 12.) Indeed, as Judge Dales noted, because the Security Agreement defines "Copyright Licenses" to mean "all agreements providing for the granting of any right in or to any Copyright (whether the Company is licensee or licensor thereunder) and the granting of any right in any derivative work based upon any copyright," Priva's (or the Trustee's) authority to grant CSI any interest in the TRSS is itself subject to Pro Marketing's security interest. (Dales Op. 10 n.6.)

Accordingly, despite the language of the License Agreement, the clear intent of the Plan (i.e., the security interest continues "notwithstanding the License Agreement or the grant of the License"), and more importantly, Judge Hughes' Opinion approving the Plan, was to permit Pro Marketing to recover its collateral in full in the event of a Priva default. CSI entered into the License Agreement knowing the risk, and Judge Hughes's Opinion confirming the Plan confirms that all of the collateral reverts to Pro Marketing in the event of a default.

Based on the language of the Security Agreement, the Plan, and Judge Hughes's opinion confirming the Plan, the Court concludes that Pro Marketing's security interest in

13

the intellectual property that is the basis of the License Agreement continues and extends to any modifications and enhancements to that intellectual property made after the execution of the Security Agreement, including the TRSS material claimed by CSI. Accordingly, Pro Marketing's Security Agreement applies to improvements to the SKSIC technology, including the TRSS.

### C. License as Proceeds

CSI contends that Judge Dales brought clarity to this case when he identified the original license as proceeds and any royalty payments to be paid as proceeds of proceeds. CSI contends that in light of Judge Dales's proceeds ruling, Pro Marketing has no possessory right in the SKSIC, and if Pro Marketing forecloses on its security interest, Pro Marketing is at best only entitled to receive royalty payments to be paid under the License Agreement that would otherwise have been paid to Priva.

Contrary to CSI's argument, Judge Dales's proceeds discussion does not purport to limit Pro Marketing's foreclosure rights. Judge Dales confirmed that Pro Marketing's Security Agreement extends to proceeds of the SKSIC collateral including the Original License and, if approved, the Amended License. (Dales Op. 15.) However, he did not suggest that Pro Marketing's security interest was limited to the License. The discussion was made in conjunction with Judge Dales's determination as to whether the Trustee's proposal to enter into an amended License Agreement with CSI and to quit-claim any interest in the TRSS was an appropriate exercise of business judgment. Judge Dales found that it was not because it was "wholly inadequate and inconsistent" with Pro Marketing's security interests

14

that were ratified in the Plan. (Dales Op. 20-21.) Judge Dales did not suggest that Pro Marketing did not have a security interest in the TRSS. He specifically declined to rule on whether the TRSS belongs to CSI free and clear of, or subject to, Pro Marketing's security interest, in light of the bankruptcy court's limited jurisdiction. (Dales Op. 10 n.7.) The Court is wholly unpersuaded by CSI's proceeds argument.

**D. Derivative Rights from the Government**

CSI contends that Pro Marketing cannot take possession of the SKSIC technology because CSI holds rights in the SKSIC technology derived from the National Security Agency, the government sponsor of the SKSIC. CSI contends that the SKSIC was developed with funds provided by the government under a contract that included the following clause: "The Contractor grants or shall obtain for the Government the following royalty free, world-wide, nonexclusive, irrevocable license rights in (technical data/computer software and computer software documentation)." CSI has also pointed to federal regulations providing that the government shall have "unlimited rights" in "data pertaining to an item, component or process which has been or will be developed exclusively with Government funds."

This argument is not sufficiently developed to enable the Court to place any stock in it. The documents CSI has provided regarding the Trusted Foundry Mask Release and Letter confirming the Trusted Foundry Mask Loan suggest that Priva has entered into some kind of a relationship with the National Security Agency, but the nature and import of that relationship, and its bearing on Pro Marketing's security interest in the SKSIC technology, is wholly unclear. (CSI Br., Exs. 25, 26, ECF No. 45.) Moreover, if, as CSI contends, the

government has a substantial interest in this case, the government has not made its position known to this Court. Accordingly, the Court finds no merit to CSI's suggestion that Pro Marketing's foreclosure is prohibited as a result of rights CSI has obtained from the government.

**E. Breach of the License Agreement and Unclean Hands**

CSI contends that Pro Marketing should be denied summary judgment because Priva improperly terminated the License Agreement and because Pro Marketing has unclean hands.

Priva terminated the License Agreement with CSI based on its assertion that CSI engaged the services of Integra Technology rather than Priva in breach of its obligation to exclusively rely on Priva to provide all services, and because CSI refused to pay for design services provided from July through October 2012. (Sibert letter, CSI Br. Ex. 11.) CSI has presented evidence that it did not breach the License Agreement and that Priva did not give it an opportunity to cure. Judge Hughes concluded after the hearing on the preliminary injunction that CSI had "a relatively strong case that it was not in breach of the license agreement." (Hughes Prelim. Inj. Op. 15.) This Court is satisfied that CSI has presented sufficient evidence to create an issue of fact as to whether it breached the License Agreement and as to whether Priva failed to give it an opportunity to cure. (*See*, *e.g.*, CSI Br., Exs. 5-11, 15, 17, 21, 27, 28, ECF No. 45.) Accordingly, for purposes of this opinion, the Court will assume that the License Agreement was not properly terminated. Nevertheless, as Judge Hughes noted in his opinion on the preliminary injunction, whether CSI breached the License Agreement is a separate and distinct issue from the question of whether Pro Marketing

should be prohibited from enforcing its security interest in the SKSIC technology after Priva's demise. (Hughes Prelim. Inj. Op. 31.) The termination of the License Agreement may be relevant to the intentional interference claims in CSI's amended complaint, but it does not have a material bearing on Pro Marketing's right to foreclose on its Security Agreement.

CSI also complains that Pro Marketing had unclean hands. CSI has presented evidence that Priva only terminated the License Agreement because Pro Marketing required it to do so, and that Priva's William Sibert had a personal stake in the termination of the License Agreement that he did not disclose to the Priva Board. (*See* CSI Br., Exs. 13, 16, 18-20.) Declaratory relief, which is what Pro Marketing is seeking in its counterclaim, is equitable relief, and thet Court is empowered to grant or withheld such relief on equitable grounds. *Great Lakes Dredge & Dock Co. v. Hoffman*, 319 U.S. 293, 300 (1943). The unclean hands doctrine "'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior.'" *Cleveland Newspaper Guild, Local 1 v. Plain Dealer Pub. Co.*, 839 F.2d 1147, 1155 (6th Cir. 1988) (quoting *Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945)).

CSI's unclean hands argument relates solely to the termination of the License Agreement. CSI contends that Pro Marketing prompted Priva to terminate the License Agreement with CSI over trumped up allegations of CSI's breach. As noted above, the termination of the License Agreement does not have a material bearing on Pro Marketing's

right to foreclose on its Security Agreement. Pro Marketing's right foreclose on the Security Agreement depends on its possessory rights to the assets and the default of Priva under the note. CSI has presented no evidence to suggest that Priva was not in default under the note, nor has CSI challenged Pro Marketing's evidence that Priva's decision to close shop was a decision made by the Priva Board without any improper influence from Pro Marketing. (Sibert Dep. 23-24, ECF No. 30-1.) The undisputed evidence reflects that Priva's board decided it was unable to continue operations and that Priva, not Pro Marketing, originated the idea of a "friendly foreclosure." (*Id.*) Accordingly, even if Pro Marketing had unclean hands with respect to the termination of the License Agreement, that does not affect the legitimacy of Pro Marketing's retaking of its collateral after Priva closed down.

## IV.

For the foregoing reasons, the Court will grant Pro Marketing's motion for summary judgment on its counterclaim, and deny CSI's cross-motion for summary judgment. The Court will enter a declaratory judgment declaring that Pro Marketing lawfully possesses Priva's collateral pursuant to its Security Agreement, and that Pro Marketing is permitted to market, sell and/or license the SKSIC/TRSS technology.

An order and partial judgment consistent with this opinion will be entered.


Dated: February 26, 2015                    /s/ Robert Holmes Bell
                                            ROBERT HOLMES BELL
                                            UNITED STATES DISTRICT JUDGE

18