UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYBER SOLUTIONS INTERNATIONAL, LLC,

    Plaintiff,

v.

PRIVA SECURITY CORPORATION, et al.,

    Defendants.
_____/

Case No. 1:13-cv-867

HON. PAUL L. MALONEY

## **OPINION**

This is an action in diversity involving Plaintiff Cyber Solutions International, LLC ("Cyber Solutions") and Defendants Priva Security Corporation and Priva Technologies, Inc. (collectively "Priva"), and Defendant Pro Marketing Sales, Inc. ("Pro Marketing") for claim and delivery of approximately 900 semiconductor chips. The matter came before the Court for a bench trial on June 27 and 28, 2017. The Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## I. BACKGROUND

Defendant Priva developed and owned microchip encryption technology known as the Secured Key Storage Integrated Circuit ("SKSIC"), which confirms a person's identity when that person attempts to access data that is stored or in transmission. Defendant Pro Marketing has a first-position lien on all of Priva's assets, including the SKSIC technology.

On April 19, 2012, Priva entered into a license agreement with Cyber Solutions, and created a second-generation SKSIC product, Tamper-Reactive Secure Storage ("TRSS"), with a new product

number, PDS8006-B. (Pl.'s First Am. Compl. ¶ 78, ECF No. 12, PageID.63.) Cyber Solutions also ordered and paid for the manufacture of a wafer in accordance with the National Security Administration ("NSA") mandated ordering protocols, which included PDS8006-B semiconductor pieces that yielded approximately 900 PDS8006-B semiconductor chips. (Pl.'s Resp. 3, ECF No. 95, PageID.1290.) As of February 2013, Priva possessed the TRSS chips, and Pro Marketing seized them as part of its foreclosure on Priva's collateral. (Pl.'s First Am. Compl. ¶ 81, ECF No. 12, PageID.64; Pl.'s Resp. to Def.'s Mot. for Summ. J. 14, ECF No. 45, PageID.530.)

This Court previously entered a declaratory judgment that Pro Marketing lawfully possesses Priva's collateral pursuant to its security agreement, and that Pro Marketing is permitted to market, sell, and/or license the SKSIC/TRSS technology. (ECF No. 48, PageID.851.)

During the two-day trial, the Court heard testimony from Douglas Benefield, Ed Cheever, and Richard Hall, and received deposition testimony from Adnan Nagarajan (Ex. 30) and Michael Emley (Ex. 31). The Court also received several exhibits from Cyber Solutions and Pro Marketing including the security agreement between Priva and Pro Marketing (Ex. 2), license agreement between Priva and Cyber Solutions (Ex. D), invoices and accounts payable reports (Exs. 15, 17, 18, 19, 20), emails (Exs. 14, 16, 23, 25, 26), Priva's bankruptcy reorganization plan (Ex. A), and the value-added reseller agreement ("VAR agreement") between Priva and Cyber Solutions (Ex. AA). At the close of Plaintiff's case-in-chief, Pro Marketing moved for a directed verdict under Federal Rule of Civil Procedure 52(c). The Court took the motion under advisement. The Court also ordered supplemental briefing from each party on whether the VAR agreement relates to the issue before the Court. Both parties waived closing argument.

**FINDINGS OF FACT**

The Court makes the following findings of fact with respect to Cyber Solutions' remaining claim for claim and delivery. Priva secured a loan from Pro Marketing. Under the terms of the security agreement, Pro Marketing had a first-position lien on certain Priva assets. The security agreement defines "collateral" as "all types or items of personal property owned by [Priva], whether now owned or hereafter arising or acquired, . . . in which [Priva] now has or at any time in the future may acquire any right, title or interest." (Ex. 2.) It defines collateral in terms of ownership: if Priva owns or acquires an item of personal property, that property becomes part of the collateral securing Pro Marketing's loan. *Cyber Sols. Int'l v. Pro Marketing Sales, Inc.*, 634 F. App'x 557, 564 (6th Cir. 2016).

On April 19, 2012, Cyber Solutions and Priva entered into a license agreement and VAR agreement. The license agreement acknowledges Pro Marketing's pre-existing security interest in Priva's assets and expressly provides that this security interest will continue despite the license agreement. Cyber Solutions' rights to future technology, as defined in § 5.2 of the license agreement, include:

> [a]ny updates, modifications or improvements to the Licensed Technology [i.e., SKSIC] developed by [Priva] and paid for by [Cyber Solutions] shall be the property of [Cyber Solutions]. [Priva] agrees to assign and agrees to assign in the future (when any such updates, modifications, or improvements to the License Technology are first reduced to practice or first fixed in a tangible medium, as applicable) to [Cyber Solutions] all right, title and interest in and to any and all updates, modifications, or improvements to the Licensed Technology (and all proprietary rights with respect thereto) whether or not patenable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by [Priva], either alone or jointly with others, during the period of Design Services engagement with [Cyber Solutions].

(Def.'s Ex. D.) This agreement establishes that all "updates, modifications, or improvements" to the SKSIC technology that Priva developed with Cyber Solution's funding would be assigned to and owned

3

by Cyber Solutions. Nonetheless, the TRSS technology falls within the scope of Pro Marketing's security interest. The license agreement acknowledges that there may be updates, modifications, or improvements to the SKSIC technology, and that Priva will first acquire the rights to such. After this initial acquisition of rights, the license agreement provides for the assignment of those rights to Cyber Solutions. Thus, the agreement contemplates that any updates, modifications, or improvements to the SKSIC technology—including the TRSS technology—will first become Priva's property, and as such, part of the collateral subject to Pro Marketing's security interest.

Under the VAR agreement, Priva would sell the SKSIC chips to Cyber Solutions and provide Cyber Solutions with a non-exclusive right to promote, market, distribute, and sell the chips. Then, Cyber Solutions would act as a reseller to market by selling the chips to potential customers, and Priva would be entitled to utilize all proceeds derived from the VAR agreement in its discretion. Mr. Cheever testified that Cyber Solutions entered into this agreement with "the ultimate goal" of selling the physical chips. (Trial Tr. 214:15-19.) He further explained that such agreements are "commonplace in the industry . . . distinct from the licensing agreement [because the] licensing agreement anticipates intangible intellectual property being developed. The licensing agreement does not address the aspects of ordering a product or selling a product or who has ownership." (*Id.* at 214:21-215:1.) Mr. Cheever testified that, "[i]f Priva had controlled and owned all intellectual property, it could have been done within the license agreement[.]" (*Id.* at 217:12-14.) The VAR agreement "specifically covers what happens when you place an order, and it says that [Cyber Solutions] is to respond to whatever protocols Priva has. . . . It also clearly states once the purchase is made, [Cyber Solutions] own[s] that chip. And then this agreement controls whatever aspects we do whatever--whoever we sell it to, not the license agreement." (*Id.* at 218:3-10.)

4

During cross-examination, Mr. Cheever agreed that Cyber Solutions "believes that once properly developed tested and completed, the TRSS PDS 8006-B product, based upon the SKSIC technology, will generate considerable profits for [Cyber Solutions] as well as significant royalties payable to defendant Priva Tech as obligated under the [license] agreement." (*Id.* at 220:24-221:5.) He further explained that "additional consideration in the form of royalty payment, based on [Cyber Solutions'] sales activity, was going to be paid to Priva and that is encompassed within the licensing agreement." (*Id*. at 222:24-223:2.) He also testified that the "chips were hand tested at Priva. They were not production certified. They were not to be sold. They were not to go into final products, which is why we are here." (*Id.* at 227:23-228:1.) Mr. Cheever admitted that the VAR agreement "specifically referenc[ed] the SKSIC chips as they existed on April of 2012." (*Id.* at 213:17-19.) Mr. Cheever disagreed with defense counsel that the VAR agreement did not apply to the TRSS chips, but he was not sure if the VAR agreement discussed modifications, updates, and improvements to the SKSIC chips. (*Id.* at 231:20-232:12.) Mr. Cheever indicated that if he could take ten minutes to review the VAR agreement, he would be able to point to where it discussed modifications or improvements to the SKSIC technology. But defense counsel did not ask any further questions and Plaintiff's counsel did not follow up with any additional questioning. (*Id.* at 233:24-234:3.) To this day, Cyber Solutions has not offered any evidence to support Mr. Cheever's belief that the VAR agreement applies to modifications, updates, or improvements to the SKSIC technology.[1]

---

[1] In its post-trial supplemental brief, Cyber Solutions argues that "the very existence of the VAR Agreement is conclusive evidence that not all of the rights between the parties flow through the License Agreement, and were never intended to." (Pl.'s Post-Trial Suppl. Br. 6, ECF No. 117, PageID.1838.) But Cyber Solutions has not shown by a preponderance of the evidence that this agreement also covers the TRSS chips.

During trial, Mr. Benefield testified in detail about the universal manufacturing process to create a microchip like the TRSS chips. First, silicon is sliced into wafers, which are run through lithography to etch certain patterns into the silicon that define the action of the chip. Then, certain metals are laid within the silicon to create circuits to complete the wafer. Once the wafer is complete, it goes to a packaging assembly where it is cut into chips. From there, the chips are put into packaging to sandwich together the original silicon and the ball joints, which contain the input and output circuits on the chip. (Trial Tr. 19:10-4.) He explained that the manufacturing has to be done by mask. Here, the NSA produced and controlled the mask; only qualified vendors could ask for permission from the NSA to produce wafers. (*Id.* at 20:16-21:4.) Priva was a qualified vendor who had permission from NSA through a mask loan (Ex. 13), so Cyber Solutions needed to order the wafer through Priva. (*Id.* at 25:16-25.) During the manufacturing process, Honeywell had the contract to run the Kansas City plant, and Cyber Solutions paid Honeywell directly to use the plant to manufacture the wafer. (Ex. 14; Trial Tr. 35:1-14.) Once the wafers came out of the manufacturing plant, Pantronix cut the chips for packaging and performed some limited testing. (*Id.* at 36:24-37:2.) Cyber Solutions paid Pantronix for this packaging. (Exs. 16, 17; Trial Tr. 37:14-39-11.) Mr. Benefield testified that he believed that Cyber Solutions "owned everything, and we had every reason to believe based on [Priva's representations] that we were proceeding under our own ownership and under the license agreement, and treating [the chips] as if [they were] ours."[2] (Trial Tr. 36:1-6.)

### III. CONCLUSIONS OF LAW

To prevail, Cyber Solutions must show by a preponderance of the evidence that Pro Marketing

---

[2] Mr. Cheever's testimony contradicts this. Mr. Cheever testified that the license agreement did not control the chips in question because they were engineering samples, not production-certified parts, and should not have been sold. (Trial Tr. 227:1-228:1; 231:5-9.)

unlawfully took or detained goods or personal property, to which Cyber Solutions has a right to possess. Mich. Comp. Laws § 600.2920; Mich. Ct. R. 3.105(A); *see also Graham Med. Techs., LLC v. Akron Med., Inc.*, No. 2:09-cv-14905, 2011 WL 1899230, at *3 (E.D. Mich. May 19, 2011).

**A. Chip ownership**

There is no dispute that Pro Marketing seized the TRSS chips on February 28, 2013.[3] The only contested issue is who owned the TRSS chips prior to this seizure. During trial, Cyber Solutions argued that it ordered and paid for the wafer, the chips, and Priva's testing of the chips. Cyber Solutions asserted that, because it bought and paid for the chips, it owned the chips from the moment that the chips were created, and that ownership never transferred to Priva. Cyber Solutions relies on the fact that neither Priva nor Pro Marketing took any steps to assert ownership of the chips until the start of litigation. But Pro Marketing seized the chips from Priva as collateral in February 2013. Also, it is not relevant whether Priva or Pro Marketing *asserted ownership* over the chips. What matters is whether Cyber Solutions has the *right to possess* the TRSS chips. The Court must evaluate which agreement controls—the license agreement or the VAR agreement—in order to determine who owned the chips at the time of Pro Marketing's seizure.

Pro Marketing argued that the license agreement controls Cyber Solutions' rights to the TRSS chips, and Mr. Benefield's testimony supports this argument. He testified that, under the license agreement, he believed Cyber Solutions owned the TRSS chips. (Trial Tr. 73:6-7.) He further testified

---

[3] Although Cyber Solutions disputed that Pro Marketing foreclosed on the chips in February 2013 in its response to Pro Marketing's motion for summary judgment (ECF No. 102, PageID.1476), during trial, Plaintiff's counsel asserted that both parties had stipulated to Pro Marketing's possession or control over the chips in question. (Trial Tr. 245:25-246:2.)

that, under the terms of the license agreement, Cyber Solutions would pay a 2% royalty to Priva for the sale of the TRSS chips. (*Id.* at 72:12-22.) Mr. Benefield did not testify about the VAR agreement; only Mr. Cheever did.

Moreover, the language in the license agreement and the VAR agreement differ. Mr. Cheever testified that the VAR agreement applied to the SKSIC technology. Neither he nor Plaintiff's counsel has pointed to a provision in the agreement, or any other evidence, to show that the agreement applies to any modifications, updates, or improvements to the SKSIC technology. Although Mr. Cheever testified that there may be an "amended schedule" to the VAR agreement, Cyber Solutions has not presented any evidence of an amended schedule. Further, in Cyber Solution's post-trial supplemental brief, it acknowledges that "the TRSS chips had not yet been created at the time that the [l]icense [a]greement and VAR [a]greement were executed and are not explicitly identified in the VAR [a]greement, as both were obviously forward-looking agreements." (ECF No. 117, PageID.1837.) But the license agreement included a specific provision to cover technology modifications and improvements; the VAR agreement did not.[4]

Section 2.1 of the license agreement granted Cyber Solutions a "worldwide, perpetual, royalty-bearing, exclusive license to the Licensed Technology to develop, make, have made, manufacture, use, import, export, offer to sell and sell Products and Systems incorporating the Licensed Technology within

---

[4] In addition, § 5(a) of the VAR Agreement requires that "[e]ach Order shall be accompanied by a valid Reseller purchase order than incorporates by reference the terms and conditions of this Agreement and does not contain any additional terms or conditions." Pro Marketing contends that Plaintiff has not presented any evidence of an "Order" or "a valid Reseller purchase order" as this section requires. Pro Marketing also asserts that Cyber Solutions has not presented any evidence of payment to Priva as required by § 6(c) of the VAR Agreement.

8

the Field." (Ex. D.) The license agreement defines "Licensed Technology" as "all Intellectual Property and Know-How (i) owned by [Priva]; and (ii) incorporated in or specifically relating to the SKSIC delivered to [Cyber Solutions] hereunder." (*Id.* at § 1.7.) It also provides "[a] royalty of 2% of Net Sales for each unit of Product or System sold under this Agreement during the Term plus a royalty of 20% of any Sublicensing Revenues received by [Cyber Solutions] during the Term[,]" which "shall accrue at the time when [Cyber Solutions] receives payment for sold Products or Systems or receives Sublicensing Revenues." (*Id.* at § 6.1.3.) Because "the [l]icense [a]greement . . . contemplates that any rights in updates, modifications, or improvements to the SKSIC technology will in fact first become the property of Priva," *Cyber Sols.*, 634 F. App'x at 564, it covers not only the TRSS technology, but also the physical chips themselves.[5] Thus, Cyber Solutions has not shown by a preponderance of the evidence that the VAR agreement covers the sale of the TRSS chips. As such, the TRSS chips first became Priva's property, subject to Pro Marketing's superior lien.

In addition to the VAR agreement, to establish its ownership of the chips, Cyber Solutions introduced the Kansas City plant's proposal to Priva, which discusses a purchase order from Priva for the manufacturing of the TRSS chips at the plant (Ex. 14), and the domestic/international wire request from Cheever Capital Management to Honeywell, the trusted foundry, on September 28, 2012 (Ex. 15). Cyber Solutions argued that these documents show that it purchased and owned the chips. But this payment was

---

[5] Cyber Solutions' amended complaint also alleges that "[p]ursuant to the [license] agreement and the transactions of [Cyber Solutions] and Defendants Priva Tech and Priva Security, [Cyber Solutions] requested and paid for the manufacture of a disc wafer including PDS8006-B semiconductor pieces to be used in manufacturing PDS8006-B semiconductor chips." (Am. Compl. ¶ 77, ECF No. 12, PageID.63.) Cyber Solutions does not assert anywhere in its amended complaint that the VAR agreement—or anything other than the license agreement—controlled.

not a sale between the trusted foundry and Cyber Solutions. The trusted foundry is nothing more than a manufacturing center, set up by the federal government for the benefit of companies doing business with the government. The parties stipulate that Cyber Solutions paid Honeywell for the manufacture of the wafer only. (Final Pretrial Order 5, ECF No. 106, PageID.1531.) Therefore, these documents do not show that Cyber Solutions owned the physical TRSS chips.

**B. Motion for directed verdict**

Pro Marketing moved for a directed verdict at the close of Cyber Solutions' proofs. When exercising diversity jurisdiction, a federal district court must apply the forum state's standard for directed verdict since the federal rule governing directed verdicts, Federal Rule of Civil Procedure 50(a), does not specify a standard for granting or denying such a motion. *Briney v. Sears, Roebuck & Co.*, 782 F.2d 585, 587 (6th Cir. 1986) (citing *Arms v. State Farm Fire & Casualty Co.*, 731 F.2d 1245, 1248 (6th Cir. 1984)). In deciding whether to grant a motion for a directed verdict, a Michigan court must "accord to the non-moving party the benefit of viewing the testimony and all legitimate inferences that may be drawn therefrom in a light most favorable to the non-moving party. If the evidence, when viewed in this manner, establishes a prima facie case, then the court must deny the motion for a directed verdict." *Agacinski v. Zamborowski*, No. 91-1850, 972 F.2d 346, 1992 WL 184580, at *3 (6th Cir. 1992) (table) (citing *Beard v. Detroit*, 404 N.W.2d 770, 774 (Mich. Ct. App. 1987) and *Thomas v. McPherson Cmty. Health Ctr.*, 400 N.W.2d 629, 630 (Mich. Ct. App. 1986)). The evidence presented at trial, when viewed in the light most favorable to Cyber Solutions, establishes a prima facie case for claim and delivery.

## IV. CONCLUSION

Although Mr. Benefield and Mr. Cheever both testified that they thought that Cyber Solutions

owned the chips, the documents tell a different story: the chip's manufacturing process is covered by the license agreement, which is subject to Pro Marketing's security interest. Cyber Solutions paid for and directed the manufacturing and testing of the chips, but not for the physical chips themselves. Cyber Solutions agrees that "Pro Marketing is entitled at most to possession of property (personal or otherwise) that was owned or acquired by Priva." (Pl.'s Post-Trial Suppl. Br. 6, ECF No. 117, PageID.1838.) Under the terms of the license and security agreement, Pro Marketing properly took the chips as collateral during Priva's foreclosure. Even though Cyber Solutions presented enough evidence to avoid a directed verdict, it failed to satisfy its burden of proof by a preponderance of the evidence that Pro Marketing unlawfully took property that Cyber Solutions had a right to possess. Accordingly, a judgment will enter in accordance with this opinion.

Dated: August 22, 2017 /s/ Paul L. Maloney
PAUL L. MALONEY
UNITED STATES DISTRICT JUDGE